UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| FRANKLIN S. YUDKIN and | ) | |
| FRANKLIN S. YUDKIN & | ) | |
| ASSOCIATES PSC, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:14-cv-02119-JMS-DML |
| | ) | |
| vs. | ) | |
| | ) | |
| CLIFFORD T. RUBENSTEIN, | ) | |
| MAURER, RIFKIN & HILL, PC, and | ) | |
| ROBERT IMBODY, | ) | |
| | ) | |
| Defendants. | ) | |

## Report and Recommendation on Motions to Dismiss

The plaintiffs in this action are attorney Franklin S. Yudkin and the

corporation through which he practices law, Franklin S. Yudkin & Associates PSC.

Unless the context requires otherwise, the court will refer to the plaintiffs

collectively as Mr. Yudkin.  Mr. Yudkin has brought claims for defamation based on

the contents of an October 30, 2014 letter defendant attorney Clifford T. Rubenstein

(of defendant law firm Maurer, Rifkin & Hill, P.C.) wrote to him on behalf of Mr.

Rubenstein's then-client, defendant Robert Imbody.  (*See* Amended Complaint, Dkt.

5, Count One, at pp. 3-11).  Mr. Yudkin has also brought claims for negligent and

intentional infliction of emotional distress based on the October 30, 2014 letter

written by attorney Rubenstein, on a November 12, 2014 letter written by Mr.

Rubenstein, and on a December 19, 2014 letter written by Mr. Imbody himself.

Before the court for a report and recommendation on their appropriate disposition are motions to dismiss filed by the defendants.  As addressed below, the magistrate judge recommends that the district judge:

1.  GRANT the motion to dismiss (Dkt. 15) filed by defendants Maurer Rifkin & Hill, PC and Clifford T. Rubenstein; and

2.  GRANT the motion to dismiss (Dkt. 32) filed by defendant Robert Imbody.

## Analysis of Motions to Dismiss

The court will first outline the allegations of Mr. Yudkin's amended complaint, set forth the guiding standard of review, and then evaluate the complaint's allegations in light of the substantive causes of actions to determine whether, as against any of the defendants, the amended complaint states a claim upon which relief may be granted.

## I.   The Amended Complaint

Mr. Yudkin's amended complaint is based mainly on an October 30, 2014 letter sent to him at his law firm's address by defendant Clifford T. Rubenstein, on the latter's law firm letterhead, in his capacity as an attorney for defendant Robert Imbody.  (Amended Complaint and Exhibit A thereto, at Dkt. 5-1).  Mr. Yudkin claims the letter defamed him and that the letter, as well as a separate letter from Mr. Rubenstein dated November 12, 2014, caused severe emotional distress, giving rise to claims for negligent and intentional infliction of emotional distress.  Mr. Yudkin's apparent theory of relief against Mr. Rubenstein's law firm and Mr. Imbody stemming from the letters is *respondeat superior*.  Mr. Yudkin's amended

complaint also alleges that a third letter, this one written by Mr. Imbody and dated December 19, 2014, gives rise to claims for negligent and intentional infliction of emotional distress.  (Dkt. 5, ¶ 46).

The letters concern a lawsuit Mr. Yudkin had filed against Mr. Imbody on behalf of his client, Fifth Third Bank, to collect a deficiency balance on an automobile loan.  (Dkt. 5, ¶¶ 14-15).  The collection case was filed in the Marion Superior Court, and Fifth Third Bank obtained a judgment against Mr. Imbody. The judgment was appealed, and Mr. Imbody obtained a reversal by the Indiana Court of Appeals.  (Dkt. 5, ¶ 14, and Exhibit G thereto, at Dkt. 5-10).  Mr. Imbody first had to convince the Court of Appeals his appeal was timely.

Mr. Rubenstein's October 30, 2014 letter focused on representations Mr. Yudkin, on behalf of Fifth Third Bank, had made to the Marion Superior Court and Indiana Court of Appeals regarding Mr. Imbody's filing with the trial court of a motion to correct error.  (Dkt. 5-1 at p. 1).  Under the Indiana Trial Rules, a motion to correct error is directed to the trial court and, if used, must be filed within thirty days after the entry of final judgment.  *See* Ind. Tr. R. 59(A).  Its filing suspends the time for appeal of the underlying judgment until the motion to correct error is ruled on or deemed denied under Ind. Tr. R. 53.3, whichever comes first.  *See Garrison v. Metcalf,* 849 N.E.2d 1114, 1115-16 (Ind. 2006) (notice of appeal must be filed within 30 days of date that motion to correct error is deemed denied under Ind. Tr. R. 53.3).

Mr. Yudkin asserted the motion to correct error was filed on May 2, 2013, and thus was not timely, which in turn made Mr. Imbody's appeal untimely. The trial court's chronological case summary ("CCS") reflected, however, that Mr. Imbody's motion to correct error was filed-stamped on April 29, 2013, "pursuant to TR5F." (Dkt. 5-1 at p. 1). The reference is to Indiana Rule of Trial Procedure 5(F), which provides that a paper filed by a mailing to the clerk "by registered, certified or express mail return receipt requested" is deemed filed upon mailing, even though received by the clerk later than the date of mailing.

Fifth Third opposed Mr. Imbody's motion to correct error in the trial court on the ground it was untimely filed on May 2, 2013, the date the entry of its filing "pursuant TR5F 042913" was made. The trial court accepted that representation and denied the motion as untimely. (Dkt. 5-1 at p. 3). Mr. Rubenstein's October 30 letter identified this representation as the first time Mr. Yudkin misrepresented the filing date. (*Id.*)

Mr. Imbody moved for reconsideration of the denial of his motion to correct error, which Fifth Third opposed, and the trial court denied the motion. (*Id.*). Mr. Rubenstein's October 30 letter characterized that opposition as the second time Mr. Yudkin misrepresented the filing date.

When Mr. Imbody appealed, Fifth Third moved to dismiss Mr. Imbody's notice of appeal as untimely because the motion to correct error had been filed too late, on May 2, 2013. (*Id.*) The Court of Appeals dismissed the appeal as untimely. (*Id.*). Mr. Yudkin then demanded Mr. Imbody pay the deficiency judgment entered

by the trial court.  (*Id.*)  Mr. Rubenstein's October 30 letter characterized the motion to dismiss the appeal as the third time Mr. Yudkin misrepresented the filing date. (*Id.*)

Mr. Imbody filed a petition for rehearing, and his appeal was reinstated. In Fifth Third's Appellee's Brief, it again stated the motion to correct error was not filed until May 2, 2013, instead of its April 29, 2013 date under Ind. Tr. Rule 5(F). (*Id.*).  Mr. Rubenstein's letter identified the Appellee's Brief as the fourth time Mr. Yudkin misrepresented the filing date.  (*Id.*)

Mr. Rubenstein's letter also complained that Mr. Yudkin's Appellee's Brief contained statements "calling into question" Mr. Imbody's masculinity (the Brief stated Mr. Imbody needed to "man up" and pay his bills).  Mr. Imbody had filed a motion to strike that reference and the references to the motion to correct error as having been filed late on May 2.  The Court of Appeals granted that motion.  (*Id.* at pp. 3-4).  Ultimately, Mr. Imbody was successful in his appeal and obtained a reversal of the trial court's judgment against him on the ground Fifth Third's complaint was filed outside the statute of limitations.  (Dkt. 5-10).

In relating the four instances in which Mr. Yudkin (for Fifth Third) stated, wrongly, that Mr. Imbody's motion to correct error was untimely filed on May 2 and obtained favorable relief for his client based on the representations, Mr. Rubenstein's October 30, 2014 letter to Mr. Yudkin also made the following statements:

- "[O]n four (4) separate occasions you filed and repeated the false and misleading statement of fact that Mr. Imbody filed his Motion to Correct Error on May 2, 2013."

- "You have denied this fact of the April 29, 2013 filing one more time than Peter denied Jesus."

- "I believe the record and facts from the trial court and the Court of Appeals appear to show that you and/or your client used the legal process for an end other than that for which it was designed during the pendency of the case and the appeal."

- "With your continued swagger and elan, you quadrupled down on presenting false evidence.  In your Appellee's Brief for the <u>fourth time</u> you misstated and misrepresented" [that the motion to correct error was not filed until May 2].  "[Y]ou used your Appellee's Brief as a platform to humiliate, emasculate and sexually harass Imbody thus calling his masculinity in question."

- "As an attorney licensed to practice law in Indiana you are assumed to be providing competent representation to your client. This competency includes the ability, thoroughness and legal skill to read and understand the entries in the CCS."

- "In this case the circumstances are that any competent lawyer by reading the CCS would know that pursuant to Trial Rule 5(F) the Motion to Correct Error was deemed filed on April 29, 2013. Each of Mr. Imbody's filings pointed out this fact and it is clear that you never investigated his claim.  You had numerous opportunities to correct your false statements made to the tribunals but you never did.  Your conduct was not 'reasonable' as the conduct of a reasonably prudent and competent lawyer would not have repeated the false facts four times.  I can see no basis in fact for your continued assertion of the incorrect filing date."

- "I am willing to listen to your explanation for what appears to be a continued pattern of presenting false evidence.  However, absent a convincing explanation, my client has directed me to file a civil suit against you and your client for claims which may include abuse of process, violations of the FDCPA and intentional infliction of emotional distress, compensatory as well as punitive damages."

- "In order to avoid a protracted legal entanglement, my client has instructed me to negotiate a reasonable offer of settlement before filing

the civil suit. . . . Mr. Imbody believes that a reasonable offer of $25,000 would fairly compensate Imbody for his damages."

(*See* Dkt. 5-1).

Mr. Yudkin responded to Mr. Rubenstein's letter by letter dated November 5. (Dkt. 5-2). He complained that Mr. Rubenstein had violated his standards of religion by the letter's reference to "filing one more time than Peter denied Jesus." Mr. Yudkin demanded a retraction, threatened to sue Mr. Rubenstein and his law firm, and explained his view that Mr. Imbody is not entitled to the large amount demanded. (*Id.*). Mr. Rubenstein replied that there was still no explanation for the representations to the Marion Superior Court and Court of Appeals regarding the filing date for the motion to correct error and demanded a substantive response by Mr. Yudkin and on behalf of Fifth Third, if Mr. Yudkin represented it. (Dkt. 5-3). Mr. Yudkin responded with a six-page letter explaining his view that his representations to the courts about the filing date are "absolutely privileged" and provided no grounds for a lawsuit. He also explained the basis for his belief that Mr. Rubenstein's original letter defamed him as a Jewish attorney. Mr. Yudkin's letter also threatened litigation. (Dkt. 5-4). Mr. Rubenstein replied with a letter stating, among other things, his withdrawal of representation of Mr. Imbody because a conflict of interest had arisen as a result of Mr. Yudkin's threatened suit against Mr. Rubenstein and his law firm if Mr. Imbody decided to pursue litigation. (Dkt. 5-5).

About one month later, on December 19, 2014, Mr. Imbody—now without counsel—wrote his own letter to Mr. Yudkin and to Fifth Third Bank. He expressed

his view that "absolute privilege" was not a complete defense and his intention to "pursue any and all legal remedies available to me" because of the filing date misstatements unless a reasonable settlement offer was made.  (Dkt. 5-6).

Ten days later, Mr. Yudkin filed his complaint.  He filed an amended complaint on January 7, 2015, to comply with the court's order to clarify the amount in controversy.  Count I asserts a claim for defamation based on Mr. Rubenstein's October 30, 2014 letter.  Count II asserts claims for "negligent or an intentional infliction of emotional distress" and references Mr. Rubenstein's October 30, 2014, and November 12, 2014 letters, and Mr. Imbody's December 19, 2014 letter. The court will assess the viability of these claims in light of the standard of review on a motion to dismiss under Rule 12(b)(6).

## II.   <u>Standard of Review</u>

To decide a motion to dismiss under Rule 12(b)(6), the court accepts as true all well-pleaded facts and reasonable inferences to be drawn from them and determines whether the complaint states "'a claim to relief that is plausible on its face.'" *McReynolds v. Merrill Lynch & Co.,* 694 F.3d 873, 885 (7th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).  Determining plausibility is "'a context specific task that requires the reviewing court to draw on

its judicial experience and common sense.'" *Lavalais v. Village of Melrose Park,* 734

F.3d 629, 632 (7th Cir. 2013) (quoting *Iqbal,* 556 U.S. at 679)).

## III.   Mr. Yudkin's Defamation Claim

A viable defamation claim under Indiana law requires:  (1) a communication

with defamatory imputation, (2) made with malice, (3) that was published, and (4)

that caused damages.  *Trail v. Boys and Girls Clubs of Northwest Indiana,* 845

N.E.2d 130, 136 (Ind. 2006).  In addition, a communication "must not only be

defamatory in nature, but false."  *Id. See also Doe v. Methodist Hospital,*  690

N.E.2d 681, 687 (Ind. 1997) ("Defamation rules apply . . . only to statements that

are false as well as defamatory."); *McQueen v. Fayette County School Corp.,* 711

N.E.2d 62, 65 (Ind. Ct. App. 1999) ("To recover in an action for defamation, that

which caused the alleged defamation must be both false and defamatory.")

The defendants contend Mr. Yudkin's defamation allegations do not state a

claim upon which relief can be granted because Mr. Yudkin has not identified and

cannot identify any false statement, because Mr. Rubenstein's letter October 30

letter was not "published," and because it is a "privileged" demand letter as a

matter of law.  The court will address these issues in turn.

## A.   A defamation claim must be based on false statements of fact, either express or implied.

Truth is a defense to a defamation claim.  *Doe,* 690 N.E.2d at 687 (truth is a

complete defense to a libel or slander claim). Indeed, the defense is embodied in the

Bill of Rights of Indiana's Constitution, at Article I, Section 10 ("In all prosecutions

for libel, the truth of the matters alleged to be libelous may be given in

justification").  Because truth is a defense, a communication is not actionable as defamatory unless it is capable of being demonstrated true or false.  This principle, as addressed below, has been applied by the Indiana Court of Appeals, by the Seventh Circuit, and it is embodied in the Restatement (Second) of Torts §566, a reference both courts relied on.  Its application most often arises in challenges to whether a speaker's *opinion* about the plaintiff is actionable as defamation or not. The principle is applicable to this case because the statements Mr. Yudkin has alleged are defamatory are either (1) not capable of being demonstrated true or false or (2) based on true statements.

A review of the cases from the Indiana Court of Appeals and Seventh Circuit will help to illustrate the importance of the requirement that a communication must be capable of being true or false to be actionable and the application of that requirement.  In *McQueen v. Fayette County School Corp.,* 711 N.E.2d 62 (Ind. Ct. App. 1999), a school girls' basketball coach stated that the plaintiff, who acted as a scout for athletic talent and as a coach at a local basketball camp, had "destroyed and undermined" the girls' basketball program.  The trial court granted the defendant coach's motion to dismiss the plaintiff's defamation claim on the ground the statement was an opinion and that opinions are not actionable as defamation. The Court of Appeals reversed, relying principally on a United States Supreme Court decision addressing the protection for free speech embodied in the First Amendment.  In *Milkovich v. Loraine Journal Co.,* 497 U.S. 1 (1990), the Supreme Court had explained that language in its earlier decision in *Gertz v. Robert Welch,*

10

*Inc.,* 418 U.S. 323 (1974), was not meant to shield from defamation claims all statements capable of characterization as the expression of opinions, because opinions often can imply the assertion of objective facts.  *Gertz* had stated that "there is no such thing as a false idea.  However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.  But there is no constitutional value in false statements of fact."  *Gertz,* 418 U.S. at 339-40.  *See McQueen,* 711 N.E.2d at 66 (discussing *Milkovich*'s explanation of *Gertz*).  *Milkovich* observed that to be actionable, a statement must at least "be susceptible of being proved true or false" in some objective way.  497 U.S. at 21-22.

The Indiana Court of Appeals thus ruled in *McQueen* that if a derogatory statement, even though couched as an opinion, "implies facts which may be proven true or false," then it may form the basis of a defamation claim.  711 N.E.2d at 66. The *McQueen* court also cited with approval a comment from the Restatement:

> If a defendant expresses a derogatory opinion without disclosing the facts on which it is based, he is subject to liability if the comment creates the reasonable inference that the opinion is justified by the existence of unexpressed defamatory facts.

*Id.* (quoting Restatement (Second) of Torts § 566 cmt. c. (1977)).  The court ruled the basketball coach's statement that the plaintiff had "destroyed and undermined" the girls' basketball program implied "verifiable facts" (in other words, facts capable of being demonstrated as true or false) regarding the plaintiff's performance and conduct as a scout and coach.  *Id.*  It refused to dismiss the defamation complaint, stating it was required to infer there was a "factual predicate" for the statement

that could be shown to be true or false.  *Id.* at 66-67.  The court agreed, however, that some statements simply cannot reasonably be interpreted as stating or implying an actual fact about a person, and thus are not defamatory.  This includes some words that are vulgar or abusive.  *Id.* at 66 n.1 ("insulting, vulgar or abusive words are not defamatory").

The Seventh Circuit's opinion in *Sullivan v. Conway,* 157 F.3d 1092 (7th Cir. 1998), also illustrates the need for a false statement of fact, either express or implied.  Coincidentally, the case concerns a suit by an attorney (named Sullivan) against a person who said "Sullivan is a very poor lawyer."  The court said the statement was not actionable as defamation because it could not reasonably be said to be based on verifiable facts that a judge or jury can determine are either true or false.  The court's discussion of this point, though lengthy, is set forth below because of its clear application to Mr. Yudkin's claims that Mr. Rubenstein's letter defamed him in his profession as a lawyer.  Judge Posner, writing for the court, explained why the statement "Sullivan is a very poor lawyer" was, as a matter of law, not actionable:

> It is one thing to say that a lawyer is dishonest, or has falsified his credentials, or has lost every case he has tried, or can never file suit within the statute of limitations.  These are all readily verifiable statements of fact.  But to say that he is a very poor lawyer is to express an opinion that is so difficult to verify or refute that it cannot feasibly be made a subject of inquiry by a jury.  It is true that prefacing a defamatory statement with the qualification, "In my opinion," does not shield a defendant from liability for defamation. The test is whether a reasonable listener would take him to be basing his "opinion" on knowledge of facts of the sort that can be evaluated in a defamation suit.  Here the answer is "no."  Legal representation is attended by a great deal of uncertainty.  Excellent lawyers may lose

most of their cases because they are hired only in the most difficult ones, while poor lawyers may win cases because they turn away all the ones that would challenge their meager abilities.  Many lawyers are good at some things and poor at others. . . , so that the evaluation of them will depend on what the evaluator is interested in.  It would be unmanageable to ask a court, in order to determine the validity of the defendants' defense of truth, to determine whether "in fact" Sullivan is a poor lawyer.

157 F.3d at 1097 (internal citations omitted).

### B. Mr. Yudkin's defamation allegations are based on matters incapable of being true or false or are based on true statements of fact.

In his response to the contention by Mr. Rubenstein and his law firm that he has not identified any false statements of fact sufficient to plausibly allege a defamation claim, Mr. Yudkin points to the following statements or implications in the October 30 letter as forming the bases of his claim.  He argues the October 30 letter is defamatory because (1) it states he made false and misleading representations to the Marion Superior Court and the Indiana Court of Appeals about the filing date of Mr. Imbody's motion to correct error, thereby implying Mr. Yudkin committed misconduct in his profession; (2) it implies he did not act as a reasonable and competent lawyer would act because of the repeated statements to the courts that the filing date was May 2, instead of the April 29 date the motion to correct error was filed under Ind. Tr. Rule 5(F); (3) it accuses him of "abuse of process" because of the misrepresentations regarding the filing date; (4) it accuses him of using the Appellee Brief as a "platform to humiliate, emasculate and sexually harass" Mr. Imbody by calling into question Mr. Imbody's masculinity; and (5) it accuses him of acting with "swagger" and "elan."  (*See* Dkt. 21 at pp. 8-10).    In

13

his response to Mr. Imbody's separate motion to dismiss, Mr. Yudkin does not identify any additional alleged false statements in the October 30 letter.  Rather, Mr. Yudkin merely contends that the letter "did contain statements that were not true and libelous."  (Dkt. 44 at p. 16).

First, to the extent Mr. Yudkin's defamation claim is grounded in the letter's general assertions that he is a poor lawyer, it fails for the same reasons the Seventh Circuit explained in *Sullivan*.  Similarly, the letter's accusation that Mr. Yudkin acted with "swagger" and "elan" are characterizations not capable of being true or false, and thus cannot support a defamation claim.

The court turns to communications in the letter that *are* capable of being demonstrated as true or false:  that Mr. Yudkin misrepresented several times the actual filing date of Mr. Imbody's motion to correct error and that he included statements in his appellate brief that questioned Mr. Imbody's masculinity.  The court agrees with the defendants that any defamatory "implication" arising from the letter's statements that Mr. Yudkin made false and misleading representations to the Marion Superior Court and Indiana Court of Appeals about the date Mr. Imbody's motion to correct error was filed cannot plausibly support a viable defamation claim.  While Mr. Yudkin may not have believed his repeated representations of a May 2 filing date were false or misleading, and while Mr. Yudkin may have an explanation why he made those repeated representations, those matters are insufficient to save his defamation claim.  It simply is true that the filing date was April 29, and it is true that Mr. Yudkin repeatedly told the

14

courts otherwise.  Similarly, it is true that Mr. Yudkin included in the Appellee Brief a statement that Mr. Imbody needed to "man up."[1]  Because the defamatory implications asserted by Mr. Yudkin are based on demonstrably true statements, his defamation claim cannot succeed.

### C.   The amended complaint plausibly alleges publication.

The defendants argue that even if the amended complaint is based on alleged false statements of fact, the defamation claim still must be dismissed because Mr. Rubenstein's letter was not "published."

Mr. Rubenstein's October 30 letter was addressed to "Franklin S. Yudkin, Attorney-at-Law," at his law office address.  The letter indicates it was typed by someone other than Mr. Rubenstein, and was sent to Mr. Imbody:  It bears the notations "CTR/rtc" and "cc:  Robert Imbody."

Mr. Yudkin's complaint alleges the letter was "published" because it (a) was seen by Robert Imbody, at whose request the letter was created and (b) was read by staff at Mr. Yudkin's office who opened the mailed letter, "as they do with all mail," and passed it to Mr. Yudkin.  (Amended Complaint, ¶¶ 12-13).

---

[1]    As the parties agree, Mr. Rubenstein's statement that Fifth Third's appellate brief was used to emasculate, humiliate, and sexually harass Mr. Imbody was based solely on the appellate brief's reference that Mr. Imbody should "man up."  Whether Mr. Yudkin's admitted use of the term "man up" humiliates, emasculates, or harasses a person because of his sex is not a question of truth or falsity.  These were Mr. Rubenstein's subjective assertions based on an objectively true fact (that Mr. Yudkin said Mr. Imbody should "man up").  It is also important to remember that the Indiana Court of Appeals granted a motion to strike the "man up" statement as inappropriate in Fifth Third's appellate brief.

Relying on three cases decided by the Indiana Court of Appeals, the defendants argue that the fact Mr. Yudkin's staff may have read the letter does not constitute publication because Mr. Yudkin's staff was acting as his designated agent to receive communications addressed to him. *Brockman v. Detroit Diesel Allison Div. of General Motors Corp.,* 366 N.E.2d 1201 (Ind. Ct. App. 1977); *Delval v. PPG Industries, Inc.,* 590 N.E.2d 1078 (Ind. Ct. App. 1992); *Melton v. Ousley,* 925 N.E.2d 430 (Ind. Ct. App. 2010).

The plaintiff in *Brockman* was a union employee who filed a grievance after being discharged because he was suspected of having tampered with manufacturing machinery. A shop foreman was present at the grievance meeting, in his capacity as a representative of union employees, including the plaintiff. The plaintiff's defamation claim was based on statements made at the grievance meeting accusing him of tampering with equipment. The court concluded there was no publication to the shop foreman/union representative because his presence at the meeting was in his capacity as an agent of the plaintiff himself. The court ruled that the publication element essential to a defamation claim is publication "to one or more third parties," and "'[i]f the language complained of was uttered only to the complaining party or to his agent representing him in the matter discussed in the communication, it is not such a publication as will support an action for slander.'" 366 N.E.2d at 245 (quoting *Mims v. Metropolitan Life Ins. Co.,* 200 F.2d 800, 801-02 (5th Cir. 1952)).

16

The plaintiff's defamation claim in *Delval v. PPG Industries* similarly failed because the defamatory statements about the plaintiff were made to the plaintiff's agent. The plaintiff's erratic activity at work and his alleged reports to others of suicidal and homicidal statements caused a company official to report the statements to mental health professionals who worked for the company's Employee Assistance Program. The court found that the mental health professionals were appropriately considered to be the plaintiff's agents and acting on his behalf in receiving the communications. Relying on *Brockman,* the court held the communications were not "published" to the mental health professionals because "[p]ublication to an agent of the plaintiff who is acting at plaintiff's behest and on his behalf is tantamount to a publication to the plaintiff himself, and as such does not fulfill the publication requirement." 590 N.E.2d at 1081 (citing *Brockman,* 366 N.E.2d 1201).

Finally, in *Melton v. Ousley,* 925 N.E.2d 430 (Ind. Ct. App. 2010), the offending communication was written by a lawyer to the plaintiff's lawyer. Again, citing *Brockman,* the court ruled that because the plaintiff's lawyer was acting on the plaintiff's behalf, his receipt of the communication did not constitute the publication to a third party that is essential to a defamation claim.

These cases, spanning a period of more than 30 years from 1977 to 2010, are persuasive authority that under Indiana law, Mr. Yudkin's staff's receipt and reading of Mr. Rubenstein's letter because they always open his mail should be deemed publication only to Mr. Yudkin himself. Mr. Yudkin himself designated his

staff to receive and act on communications addressed to him.  Mr. Yudkin urges the court to rule otherwise based on a 1937 Kentucky case, *Fordson Coal Co. v. Carter,* 108 S.W.2d 1007 (Ky. App. 1937).  But in addition to failing to show the court should apply Kentucky law instead of Indiana law (Mr. Yudkin otherwise cites Indiana cases throughout his briefs as applicable to his claims), *Fordson Coal* does not purport to address the designated agent issue decided by the Indiana Court of Appeals in the *Brockman, Delval,* and *Melton* cases.[2]  In *Fordson Coal,* the defamatory letter was addressed to the plaintiff and sent to him by registered mail, but his mother opened the letter, read it, and then apparently repeated its contents to many others.  The court noted there were cases stating if a writer knows that his recipient "because of illiteracy, blindness, or other circumstances" must have others read the allegedly defamatory letter, then an action for libel will lie, but stated that principle did not apply because the defendant had no reason to believe the mother would open a letter addressed to her son and sent to him by registered mail.  108 S.W.2d at 1009.  The court did not address a circumstance, like that in the present case, where a recipient has the capability of reading his own communications but has appointed others as his agents to receive and read them.

---

[2]      Mr. Yudkin cites another Kentucky case, *McIntosh v. Matherly,* 48 Ky. 119 (Ky. App. 1848), but its facts do not indicate that anyone other than the writer of a letter and the allegedly defamed recipient read the letter.  It too does not address whether an agent designated by the plaintiff to receive his communications may be treated as the plaintiff himself, and thus does not constitute a person to whom publication is made.

Thus, the court finds the defendants cannot be deemed to have published Mr. Rubenstein's letter to Mr. Yudkin's staff because Mr. Yudkin himself designated his staff as his agents to read communications addressed to him.  But the defendants have not cited any authority addressing whether Mr. Rubenstein's sharing of the letter with Mr. Imbody constitutes publication or not.  They do assert, however, that because Mr. Rubenstein was acting as Mr. Imbody's agent, the two are the "writer" of the communication and Mr. Imbody's having read it is not a separate publication. Mr. Yudkin has not addressed this argument.  But the court observes that if Mr. Imbody's receipt of the letter is the sole basis for a publication, then Mr. Yudkin cannot also charge Mr. Imbody with having defamed him under a *respondeat superior* theory based on Mr. Rubenstein's letter.  In other words, Mr. Imbody cannot be both the writer (for purposes of agency theory) and a separate recipient (for purposes of publication).

Nevertheless, Mr. Yudkin's publication theory extends beyond his staff and Mr. Imbody.  His opposition brief points out that Mr. Rubenstein's secretary or typist (the person whose initials are "rtc") read the letter, and he believes he should be entitled to discovery to determine who else may have read the letter.  The defendants ignored this argument.  They also ignored Mr. Yudkin's citation to *Bals v. Verduzco,* 600 N.E.2d 1353 (Ind. 1992), in which the court ruled that an intracompany sharing of communications constitutes a "publication" and is not deemed a communication with only the corporation and not to a third person.  *Id.* at 1355-56.  Based on the briefs, the court cannot find as a matter of law that sharing

Mr. Rubenstein's letter with the secretary who typed it (and perhaps others within Mr. Rubenstein's law firm) is not a publication. The court therefore finds Mr. Rubenstein has plausibly alleged the October 30 letter was "published."

### D.     The letter is absolutely privileged as a pre-suit demand letter.

The defendants urge one final ground for dismissing Mr. Yudkin's defamation claims. They argue that the October 30, 2014 letter is protected by an absolute privilege because the letter is a pre-suit demand from one attorney to another in anticipation of litigation. Some communications enjoy an absolute or qualified privilege from a defamation claim, even if the communication is actionable as defamatory, even if it was published, and even if the plaintiff suffered harm to his reputation because of the communication. *See Van Eaton v. Fink,* 697 N.E.2d 490, 494 (Ind. Ct. App. 1998). A qualified privilege attaches to "communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Bals v. Verduzco,* 600 N.E.2d 1353, 1356 (Ind. 1992) (internal quotation and citation omitted) (invoking qualified privilege for intracompany communications regarding legitimate human resources needs and concerns). The defendants do not rely on a *qualified* privilege at this stage, but rather invoke an *absolute* privilege for communications made preliminary to and in contemplation of a judicial proceeding.

Indiana courts have recognized such an absolute privilege against defamation claims for (a) statements made in the course of a judicial proceeding, (b) statements

made preliminary to a proposed judicial proceeding, and (c) statements made subsequent to a judicial proceeding. *Van Eaton,* 697 N.E.2d at 494-95. Mr. Yudkin does not dispute that an absolute privilege may apply to pre-suit communications. He argues only that the defendants cannot show as a matter of law that Mr. Rubenstein's October 30 letter meets the required elements for absolute privilege.

The public policy supporting an absolute privilege for communications connected with a judicial proceeding is the vitality and integrity of the judicial system itself. Our judicial system works best when persons engaged in the judicial process are not unnecessarily inhibited in their expression by the risk of suits for defamation. The *Van Eaton* court remarked:

> [P]ublic interest in the freedom of expression by participants in judicial proceedings, uninhibited by the risk of resultant suits for defamation, is so vital and necessary to the integrity of our judicial system that it must be made paramount to the right of the individual to a legal remedy when he has been wronged.

697 N.E.2d at 490. The *Van Eaton* court ruled that this absolute privilege of freedom or expression extends to statements by attorneys and parties and witnesses within a judicial proceeding, to "communications preliminary to a proposed judicial proceeding," and to "communications subsequent to a judicial proceeding." *Id.* at 495-96. With respect to communications preliminary to a proposed judicial proceeding, the court stated that so long as "the communication has some relation to a proceeding that is reasonably contemplated in good faith and under serious consideration . . . by a possible party to the proceeding," it enjoys absolute privilege from a defamation claim. *Id.* (citing Restatement (Second) of Torts § 588 cmt. e).

Courts in our district have relied on *Van Eaton* as establishing Indiana's recognition of an absolute privilege for allegedly defamatory statements made preliminary to a proposed judicial proceeding and with some relationship to a proceeding contemplated in good faith. *Schaefer v. Tyson,* 2009 WL 152480 at *1 (S.D. Ind. Jan. 22, 2009) (the alleged false information provided by the defendant occurred either before, during, or after the plaintiff's criminal trial, was relevant to his trial or his sentencing, and was protected by absolute privilege); *PNC Bank, N.A. v. OCMC, Inc.,* 2010 WL 3782157 (S.D. Ind. Sept. 20, 2010) (noting Indiana's recognition of absolute privilege for statements preliminary to, or as part of, a judicial proceeding and protecting statements made by receiver about the alleged theft by corporate officers because the receiver was engaged in proceedings concerning the company's business and liabilities).

There can be no serious question that Mr. Rubenstein's October 30 letter was written in relation to a judicial proceeding that was reasonably contemplated in good faith and under serious consideration by a possible party to the proceeding, as required by *Van Eaton.*

Mr. Rubenstein's detailed four-page letter sets forth an attorney's investigation of and understanding of events surrounding Mr. Imbody's filing of his motion to correct error in the Marion Superior Court and the trial court's and Court of Appeals's reliance on representations by Mr. Yudkin that Mr. Imbody had not timely filed his motion to correct error, even though he had timely filed that motion. Mr. Rubenstein cited to, and quoted from, the Indiana Rules of Professional

Conduct he asserted were relevant to measuring Mr. Yudkin's conduct in these courts.  He explained the ways in which Mr. Imbody had been prejudiced by Mr. Yudkin's statements to these courts.  He demanded an explanation for Mr. Yudkin's conduct.  He expressed that, absent a convincing explanation, Mr. Imbody contemplated bringing a civil suit against Mr. Yudkin and his client, Fifth Third, on whose behalf Mr. Yudkin had acted.  He expressed his opinion that because of the false statements that Mr. Imbody had not timely filed his motion to correct error or his appeal, a suit "may include" abuse of process, or a violation of the Fair Debt Collection Practices Act, or intentional infliction of emotional distress.  And he made a settlement demand and invited a responsive settlement offer.  (*See* Amended Complaint, Dkt. 5-1 at pp. 1-4).

Mr. Yudkin's argument that the letter should not qualify as one written in relationship to a judicial proceeding contemplated in good faith and under serious consideration is based on two main assertions.  First, he contends that the overall tenor of the letter is discourteous and disrespectful and, in particular, he takes affront to Mr. Rubenstein's reference to Mr. Yudkin's denials of the fact that Mr. Imbody's motion to correct error had a filing date of April 29, 2013 (and not May 2, 2013) as having been made "one more time than Peter denied Jesus."  Second, he contends that his own actions in the Marion Superior Court and Court of Appeals are themselves protected by an "absolute privilege," and thus could never form the basis of a good faith judicial proceeding.

The "discourteous" tenor of some portions of Mr. Rubenstein's letter do not make it any less a demand letter written in serious, good faith contemplation of litigation.  The letter expresses outrage that Mr. Yudkin represented an incorrect filing date to a trial court and to an appellate court, as part of an obvious attempt to communicate the seriousness of Mr. Imbody's felt injury and Mr. Imbody's intent and desire to pursue action for redress.  As to the phrase "one more time than Peter denied Jesus," Mr. Yudkin insists the phrase was an affront to his religious beliefs as a man of the Jewish faith, and its inclusion in the letter destroys absolute privilege.  The phrase is a literary allusion – to the Bible's story (told through certain of the Gospels) that three times Peter would deny knowing, and would deny his relationship with, Jesus.  Mr. Rubenstein did not write, as Mr. Yudkin suggests, that the Jews killed Christ, anything about the Nazis' atrocities against Jews, or the atrocities and discrimination still inflicted on Jews today.  The single phrase at the top of page 3 of Mr. Rubenstein's four-page, single-spaced letter is simply insufficient to strip the letter of its obvious relationship to a judicial proceeding contemplated in good faith and under serious consideration.

With respect to Mr. Yudkin's argument that he had absolute privilege against any suit based on the incorrect statements to the trial and appellate court, such a proposition seems a matter of reasonable debate.  Although, as explained in this order, a claim for defamation would not lie based on Mr. Yudkin's statements to the courts, the possibility of that legal claim against Mr. Yudkin does not appear in Mr. Rubenstein's October letter.  The letter mentions a potential FDCPA claim or an

intentional infliction of emotional distress claim, neither of which (anyone argues) enjoys absolute immunity because the underlying conduct took place in a judicial proceeding.  Nor is there "absolute immunity" to an abuse of process claim, though such a claim is extraordinarily difficult to prove because it requires both (a) bad intent and (b) proof that the defendant employed "improper process."'  *Reichart v. City of New Haven,* 674 N.E.2d 27, 31 (Ind. Ct. App. 1996) ("A party's intent is irrelevant where his acts are procedurally and substantively proper under the circumstances.")

Though the court does not at all purport to suggest Mr. Imbody could succeed on any legal claim based on the untrue representations made to the Marion Superior Court and Indiana Court of Appeals, the court finds that Mr. Rubenstein's letter's references to *potential* claims for abuse of process, an FDCPA violation, and intentional inflectional of emotional distress do not eviscerate the absolute privilege accorded the communication as one preliminary to a judicial proceeding contemplated in good faith and under serious consideration.

Because Mr. Rubenstein's letter is entitled to absolute privilege, the magistrate judge recommends that the district judge grant the defendants' motions to dismiss the defamation claims against them.

The court now turns to Mr. Yudkin's claims for negligent and intentional infliction of emotional distress.

## IV.   Mr. Yudkin's Claims for Negligent Infliction of Emotional Distress

The parties' briefing barely mentions Mr. Yudkin's asserted cause of action for negligent infliction of emotional distress.  The court addresses this cause of action nonetheless because the complaint purports to bring claims against the defendants for this tort.  (*See* Amended Complaint, Dkt. 5, Count II titled "Intentional and/or Negligent Infliction of Emotional Distress," at p. 11).  Mr. Yudkin's responses to the defendants' motions to dismiss contend his complaint alleges sufficient facts to state a claim for "outrage," which is a shorthand term for the tort of intentional infliction of emotional distress, but do not address the negligence variety of the emotional distress tort.   Because the complaint fails to allege facts plausibly supporting such a claim, the magistrate judge recommends the dismissal of any claim for negligent infliction of emotional distress.

There are two routes to recovery under the tort of negligent infliction of emotional distress (hereafter, "negligent infliction") under Indiana law.  One is via the "bystander rule" and the other is via the "modified impact rule."  *Clifton v. McCammack,* 2015 WL 5547140 at *1 (Ind. Sept. 21, 2015).  The bystander rule allows recovery when a person witnesses a severe injury or death of a close relative or comes upon the scene of the loved one's death or injury without advance warning of the traumatic event and while the scene is in essentially the same condition as at the time of the event.  *Id.* at *4-5.  This branch of the tort is not implicated by the letters written by Mr. Rubenstein and Mr. Imbody to Mr. Yudkin.

The "modified impact rule" is best understood by tracing decisions by the Indiana Supreme Court.  As explained in *Clifton,* for years Indiana recognized the negligent infliction tort only where the mental injury "'is accompanied by *and* results from a physical injury caused by an impact to the person seeking recovery.'" 2015 WL 5547140 at *3 (quoting *Shuamber v. Henderson,* 579 N.E.2d 452, 454 (Ind. 1991)).  The requirement that the mental distress result from one's own physical injury was eliminated in *Shuamber,* but still there must have been some direct physical impact to the plaintiff.  *See id.*  The physical impact element was met in *Shuamber* because the plaintiffs were riders in a car that was hit in a tragic traffic accident and their distress was caused not just by their own injuries but by seeing their family member die in the same collision.[3]

*Ross v. Cheema*, 716 N.E.2d 435 (Ind. 1999), is an example of a case where the events surrounding the plaintiff's mental distress did not fit the bystander rule and did not involve a direct physical impact.  There, the plaintiff was frightened by loud and persistent knocking on the door of her home, the presence of a strange car in her driveway, and the sounds of a person forcefully turning her door knob as if to break in. That person was only a deliveryman.  Although the plaintiff may have suffered severe mental distress as a direct result of the deliveryman's actions,

---

[3]     The bystander branch of the tort was recognized after *Shuamber* in a case where there was no physical impact involving the plaintiff, and the plaintiff's mental distress resulted from witnessing her brother's suffering fatal injuries from being struck by a car.  *See Groves v. Taylor,* 729 N.E.2d 569, 573 (Ind. 2000).

because there was no physical impact to the plaintiff herself, she had no claim for negligent infliction as a matter of law. *Id.* at 437.

*Shuamber's* "modified impact rule," which requires some sort of direct physical impact to the plaintiff, remains good law. *See Atlantic Coast Airlines v. Cook,* 857 N.E.2d 989, 997-98 (Ind. 2006) (refusing to eliminate the direct physical impact element in non-bystander cases).

There is nothing in Mr. Yudkin's complaint suggestive of a direct physical impact, as required by Indiana law. Although he argues that reading Mr. Rubenstein's letter and Mr. Imbody's separate letter made him feel so stressed his blood pressure went up "to unhealthy levels," that's a physical manifestation of distress itself, not a physical change or impact independent of the alleged emotional injury. The court is aware of no cases allowing a plaintiff to prove a direct physical impact sufficient to state a claim for the negligent infliction tort by relying on the physical manifestations of stress itself. That is not surprising. If physical manifestation of stress satisfied the direct physical impact element, the element would be superfluous. Any plaintiff could allege that emotional distress manifested in some physical change in the body, like higher blood pressure, or dilated blood vessels leading to sweating or reddened skin, or a feeling of chest compression, and so on. As the Indiana Supreme Court made clear in *Clifton,* its bright-line bystander and direct physical impact rules serve the purpose of drawing a necessary line to cabin a defendant's exposure to liability "not to diminish real

anguish, but simply because pragmatism demands that the line be drawn somewhere."  2015 WL 5547140 at *9.

Because Mr. Yudkin's amended complaint does not allege facts sufficient to support the element of a direct physical impact, his claims against the defendants for negligent infliction of emotional distress must be dismissed.  The court will now address the claims for intentional infliction of emotional distress.

## V.   Mr. Yudkin's Claim for Intentional Infliction of Emotional Distress

In 1991, the Indiana Supreme Court ruled that though the tort had not previously been recognized, "under proper circumstances" Indiana courts will permit liability to "attach to a defendant for an intentional infliction of emotional distress." *Cullison v. Medley,* 570 N.E.2d 27, 31 (Ind. 1991).  It looked to the Restatement (Second) of Torts § 46 (1965), to define its elements, and requires a person to have (1) intentionally or recklessly, (2) engaged in extreme and outrageous conduct that (3) causes (4) severe emotional distress to another.  *Id.* Indiana courts teach that the "requirements to prove this tort are rigorous." *Lindsey v. DeGroot,* 898 N.E.2d 1251, 1264 (Ind. Ct. App. 2009).

The conduct must, by normative standards of the community, be truly extreme and truly outrageous, exceeding all bounds usually tolerated by society and reasonably expected to cause serious mental distress in the person to whom the conduct was directed.  *Id.*  Indiana courts have relied on the following description from comment d of the Restatement to explain the type of conduct for which the tort imposes liability:

> The cases thus far decided have found liability only where the
> defendant's conduct has been extreme and outrageous.  It has not
> been enough that the defendant has acted with an intent which is
> tortious or even criminal, or that he has intended to inflict emotional
> distress, or even that his conduct has been characterized by 'malice,'
> or a degree of aggravation which would entitle the plaintiff to punitive
> damages for another tort.  Liability has been found only where the
> conduct has been so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of decency, and to be
> regarded as atrocious, and utterly intolerable in a civilized
> community.  Generally, the case is one in which the recitation of the
> facts to an average member of the community would arouse his
> resentment against the actor, and lead him to exclaim, 'Outrageous!'

Restatement (Second) of Torts § 46 (quoted in *Jaffri v. JPMorgan Chase Bank, N.A.,*

26 N.E.3d 635, 640 (Ind. Ct. App. 2015), in *Bradley v. Hall,* 720 N.E.2d 747, 752-53

(Ind. Ct. App. 1999), and in *Gable v. Curtis,* 673 N.E.2d 805, 809 (Ind. Ct. App.

1996)).

Whether alleged conduct meets this rigorous standard can, in appropriate

cases, be decided as a matter of law. *Jaffri,* 26 N.E.3d at 640-41; *Lachenman v.*

*Stice,* 838 N.E.2d 451, 457 (Ind. Ct. App. 2005); *Bradley,* 720 N.E.2d at 753.  This is

one of those cases.

Two factors, in particular, convince the court Mr. Yudkin's complaint fails to

state a claim for intentional infliction as a matter of law.  First, the court's

determination, *supra,* that Mr. Rubenstein's October 30 letter has absolute privilege

from a defamation claim perforce makes it not extreme and outrageous and

exceeding all bounds usually tolerated by society.  As the court noted in addressing

absolute privilege, that *absolute* privilege exists in furtherance of a public policy to

encourage freedom of expression when sufficiently tied to the resolution of conflict

preliminary to or as part of a judicial proceeding.  A lawyer's demand letter to another lawyer, such as Mr. Rubenstein's letter to Mr. Yudkin, which presents in great detail the facts as he understood them, presents his analysis of those facts under principles governing lawyer conduct, explains the injuries his client has suffered, describes potential legal causes of action, and makes a settlement demand is a rather commonplace occurrence in our society.  Our judicial system encourages the frank exchange of settlement demands and responses between lawyers, permitting lawyers to evaluate for themselves the worth of claims and the risks of litigation.

Mr. Imbody's own, separate letter to Mr. Yudkin and to Fifth Third Bank is neither extreme nor outrageous, for the same reasons.  The letter expresses Mr. Imbody's belief he was wronged by misrepresentations to the Marion Superior Court and Indiana Court of Appeals and states his intention to pursue "legal remedies available to me."

Second, Mr. Yudkin's complaint and his response briefs embellish, or misstate, the contents of Mr. Rubenstein's letters in an attempt to label them extreme, outrageous, atrocious, or intolerable, as required for the tort.  Mr. Yudkin says Mr. Rubenstein acted outrageously in his November 12 letter, because he threatened to contact Fifth Third directly, and a lawyer is not permitted to contact a person who is represented by counsel.  That misstates the letter.  Mr. Rubenstein specifically demanded to know whether Mr. Yudkin represented Fifth Third's interests with respect to his original October 30 letter and, if he did not, Mr.

Rubenstein would contact the "former client, Fifth Third Bank," to advise it of Mr. Imbody's position and demand, as expressed in the earlier letter. (*See* Dkt. 5-3 at p. 2).

Mr. Yudkin's most impassioned argument that Mr. Rubenstein's October 30 letter was outrageous is its statement that Mr. Yudkin denied the actual filing date "one more time than Peter denied Jesus." He asserts the statement is anti-Semitic, denigrates religious beliefs, taunts persons of Jewish faith for not believing Jesus is the Messiah, and is akin to having called him a "Christ killer," or "kike," or "goddamn Jew." (Dkt. 21 at pp. 23-25). The literary allusion, contained in the midst of four pages of single-spaced type, cannot carry that kind of load. At most, Mr. Rubenstein's reference was an ill-advised rhetorical flourish to emphasize Mr. Yudkin having repeated the same untrue information about the filing date of Mr. Imbody's motion to correct error four times. Its placement within a four-page demand letter does not rise to the level of extreme and outrageous conduct sufficient plausibly to support a claim for intentional infliction of emotional distress.

## Conclusion

For the foregoing reasons, the magistrate judge recommends that the district court:

1. GRANT the motion to dismiss (Dkt. 15) filed by defendants Maurer Rifkin & Hill, PC and Clifford T. Rubenstein; and

2. GRANT the motion to dismiss (Dkt. 32) filed by defendant Robert Imbody.

Any objections to this Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). The failure to file

objections within fourteen days after service will constitute waiver of subsequent

review absent a showing of good cause for that failure.  The parties should not

anticipate any extension of this deadline or any other related briefing deadlines.

IT IS SO RECOMMENDED.


Dated:  November 12, 2015

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana


Distribution:

All ECF-registered counsel of record by email through the court's ECF system


Service via US
Mail:

Robert Imbody
P O Box 501111
Indianapolis, IN
46250

33